23

AUSA  Terrence Berg, (313) 226-9160
~~ORIGINAL~~ (08/09)  Criminal Complaint    Special Agent  Clinton S. Schmittlein, FBI  (734) 995-1324



# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

United States of America
v.

MICHAEL KODZO AGODOA

Case:2:12-mj-30231
Judge: Unassigned,
Filed: 04-09-2012 At 03:43 PM
USA V AGODAO (CMP) (SRJ)

# ORIGINAL

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __March 24, 2010 and December 7, 2010__ in the county of __Midland__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1832(a) | (Theft of Trade Secrets) Defendant did, with intent to convert a trade secret that is related to or included in a product that is produced or placed in interstate or foreign commerce, to the benefit of someone other than the owner thereof, and intending and knowing that the offense will injure the owner thereof, without authorization possess, and did transmit, deliver, and send such information knowing the same to have been appropriated or obtained without authorization. |

This criminal complaint is based on these facts:
See Attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Clinton S. Schmittlein, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _April 9, 2012_

_____
*Judge's signature*

City and state: _Detroit, Michigan_

Honorable R. Steven Whalen, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR AN ARREST WARRANT

I, Clinton S. Schmittlein, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit for the limited purpose of establishing probable cause for an arrest warrant for MICHAEL KODZO AGODOA.  This affidavit therefore does not necessarily include all of the information gathered during this investigation.

2.      I am a Special Agent of the Federal Bureau of Investigation (FBI).  I have been a Special Agent for over eight years.  I am currently assigned to counterintelligence investigations and national security issues, to include the commercial theft of trade secrets.

3.      The statements contained in this affidavit are based on information provided by employees of the FBI, cooperating witnesses, and on my experience and background as a Special Agent of the FBI.  I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that a violation of Theft of Trade Secrets, Title 18, United States Code, Section 1832(a), has been committed by MICHAEL KODZO AGODOA .

4.      This investigation is based on Title 18, United States Code, Section 1832(a), Theft of Trade Secrets. Section 1832(a)of Title 18 provides that:

Whoever, with intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate or foreign commerce, to the economic benefit

1

of anyone other than the owner thereof, and intending or knowing that the offense will injure any owner of that trade secret, knowingly –

1.    steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

2.    without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;

3.    receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

4.    attempts to commit any offense described in paragraphs (1) through (3); or

5.    conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more such persons do any act to effect the object of the conspiracy,

shall be guilty of an offense against the United States.

A "trade secret" is defined in 18 U.S.C. § 1839(3) as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing, if

2

(A) The owner thereof has taken reasonable measures to keep such information secret; and

(B) The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

The "owner," with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed.

## DETAILS OF THE INVESTIGATION

5.      In conducting this investigation, I have interviewed engineering and management officials of WACKER CHEMICAL CORPORATION.  I have also reviewed numerous WACKER records, including emails, personnel records, and technical documents.  The information contained herein is based on the interviews I have conducted as well as documentation I have reviewed.  WACKER CHEMICAL CORPORATION, a subsidiary of WACKER CHEMIE AG, holds its North American headquarters in Adrian, Michigan.  Prior to 2000, WACKER CHEMICAL CORPORATION was known as WACKER SILICONES CORPORATION, but will be hereinafter referred to as WACKER CHEMICAL CORPORATION or WACKER.  WACKER's parent company WACKER CHEMIE AG is a publicly traded company based in Munich, Germany.  WACKER's Adrian, Michigan facility employs approximately 500 people and is home to sales and administrative offices, technical center, logistics, distribution, and production facilities.  WACKER designs and produces silicone-based products that have applications for but not limited to the biomedical and industrial

fields, and United States defense applications. One such United States defense application includes components of ammunition for the M1 Abrams Main Battle Tank.

6.      There are very difficult chemical and engineering challenges in the development of silicone products. Products must be designed to meet specific criteria and standards set by the end user. Each silicone-based product, whether it is a Liquid Silicone Rubber (LSR), Heat Cured Rubber (HCR), or Heat Treated Vulcanized Rubber (HTV), requires extensive research and development, and subsequent testing in order to meet those criteria and standards. WACKER has invested decades of research and development and millions of dollars in each of their silicone-based products to include the development of unique formulae and mixing procedures. Understanding the unique formulae and procedures for creating silicone-based products is deemed by WACKER to be proprietary technology. In 2010, the gross sales of these silicone-based products were estimated by WACKER to be $41.5 million.

7.      WACKER has taken significant and specific measures to ensure the physical security of their facilities in order to protect the secrecy of their technology. The WACKER facility in Adrian, Michigan, is surrounded by fencing and can only be accessed after first obtaining WACKER-issued identification cards. All incoming visitors to WACKER must check in with Security at the facility entrance. The WACKER facility is divided into two complexes, the Operations Plant and Technical Center. Both complexes are surrounded by a secondary fence and access to each is restricted. WACKER maintains a written security policy and requires that each employee enter into a confidentiality and non-disclosure agreement in regards to the protection of WCC trade secrets. WACKER limits the access to company trade secrets to a need to know basis. WACKER prohibits employees from bringing outside computer programs and

4

storage media into their facilities. WACKER trade secrets are also clearly marked "PROPRIETARY" or "CONFIDENTIAL". WACKER has chosen to protect the various pieces of intellectual property inherent in its silicone products as trade secrets rather than through the patent process. This is because patents on manufacturing techniques and formulae, as opposed to actual manufactured products, are notoriously difficult to enforce.

      8.    MICHAEL KODZO AGODOA, hereinafter referred to as AGODOA, entered employment with STAUFFER CHEMICAL COMPANY, hereinafter referred to as STAUFFER, in 1977 as a plant chemist. On January 3, 1977, AGODOA signed an employee agreement with STAUFFER. Included in the employee agreement are the following statements:

    a.   "I agree that any and all notes and records kept by me of worked performed in connection with my employment or in relation to any such inventions, discoveries and improvements, whether made or conceived in the regular performance of my employment or otherwise, shall be and are the sole and exclusive property of the Company; and I further agree that upon leaving the employment of the Company I will place all such notes and records in the Company's possession, and that I will not take with me without the written consent of an executive officer of the Company any notes and records related to or connected with the business, work or investigations of the Company, its affiliates and subsidiaries, or any of them, including drawings, blueprints or other reproductions."

    b.   "I agree that any secret apparatus, secret equipment, secret formula, secret method or process of the Company, whether or not developed by me, will not be disclosed

to any third party or used by me, unless I am so required in my duties to the Company or unless I shall first secure the Company's written consent, either during my employment or after my employment by the Company shall have ended."

9.      In 1987 WACKER purchased a controlling interest in STAUFFER and in turn AGODOA became an employee of WACKER.  The employee agreement that AGODOA signed with STAUFFER on January 3, 1977 was thusly continued by WACKER.

10.     During his employment at STAUFFER and WACKER, AGODOA held the following positions: Plant Chemist, Research Chemist, Product Engineer, Supervisory Researcher, and Technical Manager.  In these positions, AGODOA had direct access to STAUFFER and WACKER trade secrets to include protected formulae and procedures for producing their silicone products.

11.     WACKER CHEMICAL CORPORATION Vice President LEVI JAMES COTTINGTON, IV, was hired by and worked under AGODOA in 1994.  COTTINGTON stated that he clearly recalled AGODOA, on numerous occasions, explain to him the importance of protecting WACKER trade secrets, including, for example formulae and procedures for producing silicone products.  AGODOA provided a WACKER Inter-Office Correspondence to COTTINGTON dated July 15, 1992, with a subject heading titled, "Policy – Security of Data".  The Inter-Office Correspondence was included in COTTINGTON's WACKER Employee Handbook which was given to him by his then supervisor, AGODOA.  The correspondence states as follows:

"To ensure that confidential data such as monthly reports, formulations, specifications, test methods, master plans, flow sheets, environmental related data, manufacturing costs, planning data, etc., are not accessed to unauthorized persons the guidelines listed below need to be followed:

-don't forward this information to unauthorized persons.

-don't permit unauthorized people to have access to this data.

-report immediately to your supervisor when you have lost your keys.  The Maintenance Superintendent will maintain a central record of who has been issued key and for what area.

-destroy confidential paper personally in the shredder.

-mark confidential papers.

-don't take confidential papers outside the premises.

Each Supervisor is responsible for the people working in their area."

12.     During the course of AGODOA's employment with WACKER, and specifically while serving as Technical Manager, AGODOA was required to sign or initial Formula and Manufacturing Instruction sheets.  The Formula and Manufacturing Instruction Sheets, clearly marked "CONFIDENTIAL", contain WACKER's recipes and procedures for creating their various protected trade secrets.  During a five year span, from 1991 to 1996, AGODOA signed approximately 78 Formula and Manufacturing Instruction sheets that were so marked as

CONFIDENTIAL, and was therefore well aware that such information was intended to be kept secret by WACKER.

13.     AGODOA's employment file reflected disciplinary action that was taken against him on June 6, 1994, with regard to his willful violation of company policy. WACKER had discovered that AGODOA had given out chemical samples to visitors of WACKER, which not only violated company policy but potentially United States laws and regulations. As punishment, AGODOA's expected promotion was delayed several months.

14.     In July of 1997, AGODOA resigned from his position at WACKER in order to accept a position at JAMAK FABRICATIONS, a subsidiary of JMK, INTERNATIONAL. JAMAK, considered to be a competitor of WACKER, was provided a notification via certified mail on August 14, 1997, of WACKER's concern that AGODOA keep confidential any and all of WACKER's trade secrets. Included in the notification was the following:

    a.  "Since Wacker Silicones Corporation is primarily involved in the manufacture, distribution and sale of silicone products, we are writing to you in regard to Mr. Michael Agodoa, who, we understand, has accepted a position with one of your companies, Jamak Fabrications. It is our understanding that his duties will encompass essentially the same or similar responsibilities as an employee of Wacker Silicones Corporation.

    b.  As an employee of Wacker Silicones Corporation, Mr. Agodoa, in his job assignment, had access to trade secrets and other valuable confidential and proprietary information, including technical and customer information. Since Mr.

Agodoa's work involved development and technical service of products, such as custom rubber formulations which included oil bleeding connector seals and proprietary ingredients, in particular Y215 (a foaming agent), for specific customers and markets, he had complete and unrestricted access to, among other things, research data, sensitive information on new products (being developed or to be developed) and markets for such products, specific customer profiles and their product requirements, formulation and compositional data, prices and other strategic market information.

c.  We believe it would be beneficial to put you on notice of his obligation to keep confidential and not divulge or use any of Wacker Silicones' trade secrets and confidential information to which he had access or had acquired as an employee of Wacker Silicones Corporation, whether or not specifically listed in this letter. Any disclosure or use, whether direct or indirect, by him to you or to any third party would be a breach of his continuing legal obligation to Wacker Silicones Corporation. The foregoing prohibitions include the following of fruitful or the avoidance of unfruitful avenues of pursuit whether as to product development or customer solicitation, or otherwise."

15.   On September 22, 2004, AGODOA was hired by LAUR SILICONE, INC., hereinafter referred to as LAUR SILICONE, as a Senior Scientist, Research and Development. According to LAUR SILICONE, President DANIEL T. LAUR, hereinafter referred to as LAUR, AGODOA was considered to be one of the best silicone chemists in the area.  During his employment with LAUR SILICONE, AGODOA was personable and an overall good employee.

However, AGODOA was not always forthcoming with customers with regard to changes to LAUR SILICONE products. AGODOA believed that it was unnecessary to inform customers of product formulation changes. LAUR SILICONE Vice President CHARLES D. LENK, hereinafter referred to as LENK, stated that AGODOA liked to bend company procedures.

16.      In or around late Spring 2010, AGODOA informed LAUR and LENK that he and his family were involved in the construction of schools in his native country of Ghana. AGODOA stated that a town (unidentified) in Ghana had discovered oil reserves and that a South Korean company (unidentified) was interested in developing those reserves. In return, the South Korean company would compensate the Ghana town by constructing schools. AGODOA explained that because he and his family had experience in school construction, the South Korean company asked AGODOA to assist with the project. AGODOA informed LAUR and LENK that he would need to travel to Ghana and/or South Korea for two weeks at a time every other month. LAUR and LENK approved of the travel and time away from work at LAUR SILICONE, because they understood, based on his statements, that AGODOA was working for a good cause. LAUR also instructed AGODOA to purchase a laptop computer so that AGODOA could remain in contact with LAUR SILICONE, while overseas.

17.      In or around late Autumn 2010, questions began to rise as to what AGODOA was actually doing when he traveled to South Korea and/or Ghana. When questioned by LAUR, LENK and other LAUR SILICONE employees, AGODOA always provided vague responses, and never seemed to discuss the project in any detail. In or around May 2011, LAUR approached AGODOA and informed him that his overseas travel was beginning to impinge upon his work as AGODOA was needed at LAUR SILICONE.

18. In or around June 29, 2011, AGODOA provided LAUR with a letter of resignation, stating that he had been consulting on the Ghana school project and working with authorities in South Korea. AGODOA further stated that he had accepted a consulting position with KCC SILICONES, hereinafter referred to as KCC, a subsidiary of KCC CORPORATION, headquartered in Seoul, South Korea and a competitor of LAUR SILICONE and WACKER. During AGODOA's exit interview at LAUR SILICONE, he stated that he would be working with silicone bases and that his work at KCC would not compete with LAUR SILICONE products. During the exit interview, AGODOA signed a Covenant of Confidentiality, Assignment and Restrictive Covenant.

19. On July 1, 2011, LENK, Vice President of LAUR SILICONE, contacted COMMERCIAL SOFTWARE, INC., the administrator of LAUR SILICONE's GOOGLE email system. LENK contacted COMMERCIAL SOFTWARE to have the password for AGODOA's GOOGLE account changed, as is the normal practice when an employee leaves LAUR SILICONE. LENK learned from the COMMERCIAL SOFTWARE representative that AGODOA had contacted COMMERCIAL SOFTWARE earlier that day in an attempt to change the LAUR SILICONE password. AGODOA was unsuccessful in his attempt as the individual at COMMERCIAL SOFTWARE responsible for changing passwords was not present when he called. LENK immediately changed the LAUR SILICONE passwords and instructed COMMERICAL SOFTWARE that only LAUR and LENK had the authority to make password changes.

20. CHRISTOPHER PLAINTE, hereinafter referred to as PLAINTE, is the Vice President of LINKED TECHNOLOGIES, INC., and the LAUR SILICONE Internet

11

Technologies (IT) Administrator.  On July 1, 2011, as standard procedure when an employee

resigns from LAUR SILICONE, PLAINTE arrived at LAUR SILICONE to make system and

password changes to the IT System.  As part of PLAINTE's review, he went onto LAUR

SILICONE's GOOGLE account to review AGODOA's email activity.  During the review,

PLAINTE discovered email, travel records, and invoices indicating that AGODOA had not

traveled to Ghana and South Korea to build schools, but rather appeared to have been selling

WACKER proprietary trade secrets to representatives from KCC SILICONE.  AGODOA had

utilized his LAUR SILICONE email account, mkagodoa@laursilicone.com, to correspond with

KCC.

      21.     Shortly after the discovery, LAUR notified LEVI JAMES COTTINGTON, IV,

WACKER Vice President of Engineering Silicones, of the evidence found within AGODOA's

former LAUR SILICONE email account and subsequently forwarded copies to COTTINGTON.

On November 14, 2011, Michael M. Briley, of Shumaker Loop & Kendrick LLP, and WACKER

legal counsel, contacted the Federal Bureau of Investigation, Detroit Field Office to document

the theft of WACKER trade secrets.  On December 14, 2011, WACKER representatives

provided the Federal Bureau of Investigation copies of the aforementioned emails that

demonstrate probable cause to believe that AGODOA had committed the theft and transfer of

WACKER trade secrets.

## EVIDENCE OF THEFT OF TRADE SECRETS

      22.     The following summary is based on my review of the contents of AGODOA's

email account, mkagodoa@laursilicone.com, which I received in the course of this investigation,

and which AGODOA used during his employment with LAUR SILICONE, as well as my

review of AGODOA's MSN email account, magodoa@msn.com, which was obtained as a result of a federal search warrant served on MSN.

23.     From my review of these emails, I have determined that as of January 1, 2010, and even before that time, AGODOA was seeking employment with competitors of LAUR, including with KCC.  My review of the emails showed that, in March of 2010, AGODOA was discussing providing KCC with recipes and processing information for silicone products from Wacker and from other companies.  For example, on March 11, 2010, AGODOA sent a email from his account, magodoa@msn.com  to Mr. WONG at woncom1@kcc.co.kr .  In the email AGODOA states, "Below is another formulation you should try.  This is a Dow Corning recipe. If you have problems getting some of the ingredients let me know so we can discuss possible substitutes."   Agodoa then provides a four component recipe which included percentage to use, material name, CAS (Chemical Abstracts Service) number, and the recommended amount.  The CAS number is a unique identifier from the Chemical Abstracts Service registry that, according to www.cas.org is the most authoritative collection of disclosed chemical substance information, containing more than 65 million organic and inorganic substances and 63 million sequences.  For example, 58-08-2 is the CAS Registry Number for caffeine.

24.     On March 18, 2010 SANG BOK LEE, LSR Team Manager, KCC Central Research Institute, thanks AGODOA for his prompt response.  As stated above, "LSR" stands for Liquid Silicone Rubber.  On March 18, 2010, AGODOA  replied to Ms. HONG at hongyj@kccworld.so.kr and carbon copies  contact "SangBok Lee".  AGODOA stated "I have attached a Powerpoint slides showing the process used by company W to produce their LSR.  As you see, they use a two-step process.  First they make an LSR BASE.  This base is divided into

two and catalyzed into Part A or crosslinker is added to Make part B.  This way both sided A &

B have the same viscosity."

25.     On or around March 24, 2010, AGODOA received an email message on his

LAUR SILICONE account from KI JONG KIM, a KCC representative utilizing the email

address, kkj1685@kccworld.co.kr.  In the email, KIM stated the following: "Dear Mr. Mike

Agodoa, Thanks for your help.  Because I didn't know powersil 351 type compound, Your recipe

was very useful to me."  KIM then asked AGODOA questions about the formula, and then

stated: "I always appreciate your support of powersil 351 type compound.  Regards, KI-JONG,

KIM."  Attached to the email were two Microsoft Excel spreadsheets.  One spreadsheet

contained WACKER's formula for POWERSIL 351 and the other spreadsheet contained a

formula for a component of POWERSIL 351.  It is believed that the aforementioned attachments

sent by KIM, originated from AGODOA in a previously sent email.  POWERSIL 351, a Heat

Cured Rubber (HCR), is considered to be one of WACKER's protected flagship products.

COTTINGTON has confirmed that this formula is substantially the same as WACKER's current

formula for POWERSIL 351, and such formula was and remains a confidential formula that

WACKER takes reasonable measures to keep secret.

26.     On April 29, 2010, AGODOA sent an email to SANG BOK LEE, LSR Team

Manager, KCC Central Research Institute, using his aforementioned LAUR SILICONE email.

In the email AGODOA stated that he was attaching an invoice for his consultation services.

Attached to the email was a Microsoft Excel spreadsheet that contained AGODOA's invoice to

KCC CORPORATION COMPANY, LTD, for the months of April and May 2010.  The invoice,

numbered 042410-2, was broken down into the following: "April/May 2010 consulting - 8000";

14

"Off-site working fee – 4000"; and "Mobile telephone – 91"; "Total – 12,091". Also included in the invoice was the following: "Please remit payment via wire transfer to: Bank: Michael K. Agodoa, Members First Credit Union, 600 Wackerly Street, PO Box 2165, Midland, MI 48641-2165; Routing #: 2724-8284-1; Account #: 11013100".

27.     On May 6, 2010, SUNG-JIN CHO, HTV Research Team, KCC CENTRAL RESEARCH INSTITUTE, responded to AGODOA's aforementioned LAUR SILICONE email account. CHO stated the following: "Dear Mr. Agodoa. This is Cho from KCC HTV TEAM. How are you doing? According to the contract, We will progress it (April and May consulting fees) as your invoice. You can receive it soon. Could you kindly send us mobile phone receipt($91)? Because our management team requested it. Pls check the receipt and send us by email. And I will wait for your remaining consulting report. I hope you will send us soon. Sincerely Cho".

28.     As identified in email exchanges between AGODOA and KCC representatives, AGODOA's consulting arrangement with KCC required that he submit consultation reports directly to KCC President CHUNG MONG-IK via CHUNG's email address at michung@kccworld.co.kr. On or around July 16, 2010, AGODOA sent an email to CHUNG using his aforementioned LAUR SILICONE email account. In the email AGODOA stated: "Dear Sir, Below and attached is a summary of my consultation with LSR and HTV technical departments during the month of July 2010. I hope this format meets your requirements. Please let me know if you would like a different format or additional [sic] details. Thank you very much. Michael K. Agodoa". Attached to the email, and in Microsoft Word format, was the consultation report that AGODOA referenced.

29.     On or around December 1, 2010, WON SEOKJAE, a KCC Senior Researcher, sent an email to AGODOA's LAUR SILICONE email address, mkagodoa@laursilicone.com, and stated in part: "you told me that you would contact me back in the U.S. for LSR Manufacturing Process using kneader in WACKER USA.  Please send me by email LSR Manufacturing Process using kneader in WACKER USA."  WON continued: "At last July consulting we talked about LSR for high tear resistance.  I was curious for Elastosil 3043/40. You told me secret: and then you told me 'if you promise me only you know yourself, I'll tell you for Elastosil 3043/40 formulation.'  Do you remember that?  I certainly remember.  Could you tell me Elastosil 3043 formulation?  I am waiting for your reply.  Always thank you for your help."

30.     The LSR or Liquid Silicone Rubber Manufacturing process referenced above is believed to be WACKER's specific and unique process for creating many of their products.  In order to manufacture Liquid Silicone Rubber or Heat Cured Rubber, there are two key components required.  The first component is the actual chemical formula or recipe.  The second component is the actual procedure for mixing the ingredients that make up each product.  The "kneader", referenced in the above email is a term used to describe the piece of equipment used to mix the ingredients found in WACKER's silicone products.

31.     On December 7, 2010, AGODOA responded to WON utilizing his personal "msn" email account, magodoa@msn.com, and also carbon copied his response to his aforementioned LAUR SILICONE email account.  AGODOA stated: "The information you requested is attached.  Sheet 2 has the typical mixing instructions.  Note: This is highly confidential."  Attached to AGODOA's email was a Microsoft Excel spreadsheet that contained

16

the formula and mixing procedures for ELASTOSIL 3043-40.  At the top of the document, in red

bold letters, was the word "CONFIDENTIAL".  The chemical formula and mixing procedures

that were referenced above were indeed WACKER's ELASTOSIL 3043-40.  WACKER also

considers ELASTOSIL 3043-40 to be one of their flagship products.  COTTINGTON has

confirmed that this formula is substantially the same as WACKER's current formula for

ELASTOSIL 3043-40, and such formula was and remains a confidential formula that WACKER

takes reasonable measures to keep secret.

32.     On December 8, 2010, WON sent an additional email to AGODOA's

aforementioned LAUR SILICONE account.  WON stated: "nothing but, I would like to ask you

are 401/70 recipe.  Our first meeting in this year you gave me WCC 401 series below recipe

(formula follows for R401 70)."  WCC 401 is believed to be a reference to WACKER

HCR/HTV 401 SERIES products.  WACKER considers the HCR/HTV 401 SERIES to be one of

their flagship products.  It is unclear from the e-mails in the LAUR SILICONE account whether

AGODOA responded to this request and provided the 401/70 recipe as requested.  Although

there is no reply e-mail contained within the LAUR SILICONE account, it is unknown whether

AGODOA responded using the MSN personal e-mail account, as he had done previously.

33.     Further email evidence demonstrates that AGODOA discussed with KCC

representatives the following WACKER formulae: LSR 3015, LSR 3003/20, LSR 3003/30, LSR

3003/40, and HCR/HTV 407 SERIES.  While there was mention of these formulae in emails, no

specific evidence found in the LAUR SILICONE email account can confirm whether or not

AGODOA provided these trade secrets to KCC.

34.     Each of the formulae referenced above, and in the aforementioned emails, are highly guarded WACKER trade secrets.  WACKER has and continues to take reasonable measures to protect their secrets as previously mentioned.  The loss of these trade secrets to a competing company, like KCC, would likely do significant financial damage to WACKER.  The financial damage would likely be felt for many years to come as the many uses of WACKER products, grows significantly every year.  There are a variety of uses for each of these products ranging from the insulation for electrical power lines, medical grade tubing, and United States defense applications such as ammunition components for the M1 Abrams Main Battle Tank.

35.     During AGODOA's employment at LAUR SILICONE, he indicated to President DANIEL LAUR, Vice President CHARLES LENK, and other co-workers that he traveled to Ghana and South Korea in order to work on his school building project.  AGODOA had in fact traveled to South Korea but as part of his consultation arrangement with KCC.  In the emails provided by WACKER, AGODOA never discussed school construction or Ghana with representatives from KCC or any other Korean company.

36.     On or around April 1, 2010, AGODOA received, on his LAUR SILICONE email account, an "e-ticket" and travel itinerary for round trip flights between Saginaw, Michigan, and Incheon, South Korea.  The "e-ticket" was forwarded to AGODOA by SANG BOK LEE, LSR Team Manager, KCC Central Research Institute.  LEE stated the following in the email: "Dear Agodoa!  This attached file is your e-ticket for this April consulting  Is it ok?  Please confirm this ticket  And then I will send confirmed ticket  Thank you so much!  Best regards!  SANG BOK, LEE".  Additional emails provide evidence to show that the intended purpose of AGODOA's travel to South Korea was to act as a consultant for KCC.

18

37.     The Bureau of Immigration and Customs Enforcement has several records regarding AGODOA in their TECS database.  The database indicates that AGODOA has traveled to South Korea at least twelve times since July 2010.  Thus, if AGODOA intended to provide hard copies of any WACKER formulae to KCC without creating any email evidence of such transfers, AGODOA had ample opportunity to do so during any of his 12 visits to South Korea.

38.     On or around June 29, 2011, and the same day AGODOA resigned from LAUR SILICONE, AGODOA sent an email to KAZUNORI OKAMOTO's email account, kokamoto@kcc-silicone.com.  In the email AGODOA stated: "Please change my email address to the following: magodoa@msn.com."

39.     Results of a Grand Jury Subpoena served on MEMBER'S FIRST CREDIT UNION, herein after referred to as MFCU, were received on March 09, 2012.  These records covered AGODOA and his wife VIVIAN AGODOA's MFCU accounts from January 01, 2010 until January 31, 2012.  A review of the provided records indicated that between, March 22, 2010 and AGODOA's resignation from LAUR SILICONE on June 29, 2011, AGODOA received approximately $60,930.38 in international wire transfers from KCC.  This covered the same time period while he maintained employment at LAUR SILICONE, but had indicated to President DANIEL LAUR, Vice President CHARLES LENK, and other co-workers that he traveled to Ghana and South Korea in order to work on his school building project.  This was also approximately the same time frame of the above referenced emails between AGODOA and representatives of KCC, indicating he was providing WACKER trade secrets to KCC.  MFCU records also indicate from approximately March 26, 2010 until March 11, 2011, AGODOA wire

19

transferred approximately $37,397.00 to KWAME AGYAPONG in Ghana.  Since his

resignation from LAUR SILICONE, AGODOA has received approximately $71,691.04 in

additional wire transfers from KCC.  In total, the records showed that AGODOA received

$132,621.42 in KCC wire transfer funds from March, 22, 2010 until January 31, 2012.

     40.    On March 16, 2012, results of a search warrant served on Microsoft Network for

AGODOA's magodoa@msn.com account were received.  One email exchange occurred

between a recruiter who placed AGODOA with KCC, and another individual or prospective

recruit for KCC who, from the email exchange, appears to be considering a position with KCC

and wants AGODOA's opinion about working with KCC.   The other prospect asks AGODOA

questions such as "what are the principal gaps between KCC Silicone's physical and people

resources and a world class level performance?"  AGODOA replies, "I think the principal gap is

the level of technical know-how.  In my assessment they are about 30 years behind other

suppliers in Europe and America, but are learning fast.  You will find them eager to learn, but

want to take short-cuts rather than do the hard work to find answers.  They simply want

formulations of competitor's products and don't really care to understand the technology or

knowledge behind it.  I find it a bit uncomfortable at times."  The prospect then asks, "in your

area of application expertise how well integrated are the commercial and technical plans?"

AGODOA replies,   "From my experience, they have some specific competitor products that

they are targeting and would like to produce me-too products to compete with.  There is

tremendous pressure from management onto the technical and sales teams to sell.  Therefore they

pressure to bypass technical know-how from immediate recipes to make material for the

market."

## PROBABLE CAUSE

41.     Based on the information I have learned from WACKER officials, I am aware that MICHAEL KODZO AGODOA at one time had direct access to the WACKER CHEMICAL CORPORATION trade secrets in the course of his prior employment with WACKER.  As a result of my review of the above-referenced emails, I have probable cause to believe that AGODOA is in unlawful possession of and has transferred certain WACKER CHEMICAL CORPORATION trade secrets, including in particular the formula for POWERSIL 351, a Heat Cured Rubber (HCR), and the formula and mixing procedures for ELASTOSIL 3043-40, one of WACKER CHEMICAL CORPORATION's flagship products to KCC SILICONES while still under the employment of LAUR SILICONE.  AGODOA utilized his aforementioned LAUR SILICONE email account as well as the aforementioned personal email account of magodoa@msn.com to transfer these trade secrets to KCC and to communicate with officials of KCC concerning their requests for certain trade secrets of WACKER, including specific formulae.  The abovementioned emails indicate that AGODOA negotiated a consultation agreement with KCC and as part of said agreement, AGODOA was financially compensated.

42.     I have also interviewed personnel from WACKER, including COTTINGTON. COTTINGTON stated that WACKER sales persons have reported receiving information from customers or potential customers who are being solicited by KCC to purchase KCC silicone-based products.  COTTINGTON stated that these customers reported that KCC was representing that their silicone-based products were "the same" as WACKER products.

43.     I therefore have probable cause to believe that on multiple occasions, AGODOA did in fact engage in the theft of and transfer of WACKER CHEMICAL CORPORATION trade

21

secrets to KCC SILICONES, in violation of 18 U.S.C. § 1832. These actions appear to have

been taken for AGODOA's personal financial gain and to procure employment with KCC.

44.     In particular, the facts summarized herein provide probable cause to believe that

on or about March 24, 2010 and on or about December 7, 2010 MICHAEL KODZO AGODOA,

with the intent to convert certain trade secrets that are included in products that are placed in

interstate and foreign commerce, to wit: WACKER's formulas for POWERSIL 351, a Heat

Cured Rubber (HCR), and its formula and mixing procedures for ELASTOSIL 3043-40, to the

benefit of someone other than WACKER, and while intending and knowing that the offense

would injure WACKER, did possess such trade secrets knowing they was stolen or appropriated,

and did replicate, transmit, deliver, send and communicate such trade secrets, in violation of Title

18, United States Code, Section 1832(a).

## CONCLUSION

45.     In consideration of the foregoing, your affiant respectfully requests that

this court issue an arrest warrant for MICHAEL KODZO AGODOA.

Clinton S. Schmittlein
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me, this 9th day of April, 2012

HON. R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE